Thank you very much for having me here. I want to invite the court's attention to exactly what the argument is of the plaintiffs and the deputies. They are seeking a jury trial. They're appealing for a grant of summary judgment, so the record obviously needs to be viewed in their favor. There are two claims. The first is that these two officers who used the tasers subjected the deceased to excessive force by tasing him repeatedly, causing his death. The second is that the St. Louis County, acting vicariously through its officers, failed to accommodate the deceased's disability, which in this case was a mental illness of schizophrenia. I'd like to invite the court's attention to exactly what the facts are that the plaintiffs urged would overcome the summary judgment motion that was made in court. Now, there was a course of conduct that this mentally ill man engaged in, and when the police arrived, he was alone in the family home. He had committed no crime other than acting out with his psychosis. His mother explained to the officers that he had been diagnosed with schizophrenia, that he needed to go to the mental hospital, that he had been hospitalized before, and that he had not used any weapons. There was a firearm in the home. The officers, there were six of them, took positions in the front of the house. He either came out of the house or was ordered out of the house. The records are unclear on that. He had not a stitch of clothing on him and nothing in his hands, so he was clearly unarmed. He then complied with Officer Nathan's instruction to lie down on the lawn, and he even put his hands behind his back and interlaced his fingers so he could be handcuffed. At this point, for reasons that are not clear, he wasn't handcuffed, but some period of time went by. He stood up, he said, yep, Jesus, gotta go. This was a continuation of his delusional thinking, which had this religious compliment. And he was caged by Officer Persich. The tasers, you could see the darts, they went all the way in. He immediately went down on the ground on his back, and his hands were presented for handcuffing. Now, the taser has what is called a data port, which is a computer chip which records the duration of the shots and the timing of the shots. So we know from the physical evidence exactly what happened, and it's somewhat inconsistent with what the officers said. There was a five-second discharge, there was a two-second gap, and then a second five-second discharge for a total of 12 seconds. That two-second gap was not enough time for Sam Du Bois to do anything other than sort of lay there between the two discharges. So there was a period of 12 seconds. Up until this point, plaintiffs do not contend that anything that the officers did violated either the Fourth Amendment or the ADA. I think in retrospect, things could have been handled a little bit better. Certainly, he could have been talked to more calmly. The use of pointing an AR-15, shotguns, handguns at him was unnecessary, but the law allows a certain amount of leeway and discretion of officers to make these kinds of decisions. The officers were given very specific training on how to use this taser device on someone who is mentally ill like Sam Du Bois. He is not supposed to be tasered over and over again. In fact, officers are instructed that can be highly dangerous, especially to somebody who is in this kind of state. The taser is designed, and the officers were trained, that it creates what is called a window of opportunity. And that's the exact phrase that's used in the training. A window of opportunity for the handcuffing of the controlling officers to move in and put the person in restraints. In this case, there is an initial 12-second period. Sam Du Bois was on his back on the family lawn without any clothes on with his arms actually in front of him, hooked up to taser wires with five other officers present. Everyone knew that he was mentally ill. And the plan's intention is that according to training, the handcuffing officers, including Officer Lively, who's right there, the next officer to have the taser, should have simply moved in and put him in handcuffs. And had they done so, there would have been a much better result to this incident. Instead, ignoring the training, after the taser stopped, and there was a period of about another second, apparently Mr. Du Bois rose to his feet again, was tasered, went down, again another window of opportunity not taken. Again he stood up, and this happened over and over again until Officer Lively's taser apparently stopped working. The wires got tangled or something. And then immediately after that, I'm sorry, Officer Persich's taser stopped working. Officer Lively fired, and there were a total of eight discharges, each five seconds long, meaning a total of 40 seconds after the initial two 10-second discharges. So we're talking about 50 seconds of electrical current over a time of about two minutes. And plaintiffs urged that the court focus on whether the use of the final eight discharges, that's 40 seconds plus there's a two-second drive stop at the end, but principally the 40 seconds after the initial two, which created the window of opportunity, whether each of those could be found by the jury in light of the police training on the use of the window of opportunity to safely restrain someone and to avoid multiple discharges, whether a jury could find that that was excessive force. We think this is very close to the situation that was decided recently in Roberts versus City of Omaha. A case that was decided after the magistrate judge, the district court, in this case, decided summary judgment. That in that case, it was also a mother calling her mentally ill son was acting out. He was in the family home. In that case, the force was firearms. There were additional shots. This court remanded for a jury trial because the Senate amendment doesn't provide the right for a jury to decide these kind of facts. Now, the defense has said, well, we couldn't follow the window of opportunity. There was this factor. There was that factor. The wires were in the way, et cetera. This is exactly why we had jurors to sort out whether or not their failure to follow their training was reasonable under the circumstances or not. Are there list answers that can be used in this incident? Do I have different modes or settings? No. There's two ways it can be used. There's a cartridge that's on the barrel of the device, and it fires two darts. And when both the darts penetrate, they're attached to wires, and that completes an electrical current. And that's called prologue. And since Sam DuBose had not stitched his clothing on and the darts were left in his body, they're clearly visible in the autopsy photos, penetrated all the way to the half-inch depth. So that's how most of the current, at least 50 seconds of it, was delivered. The cartridge can be unclipped and popped off, and then there's two electrodes that are exposed. The trigger can be then pulled. It will discharge electricity, and the electrodes can be pushed into the flesh, and that's called a drive stunt. There's some evidence that the officers drive stunts after the 50 seconds in prologue. It's all one level of electrical force, and it's a very powerful shot. It's about 3 amps per pulse, 19 pulses a second. It's a very powerful debilitating device that, when used repeatedly, has health effects. To me, the more difficult issue with the case is its qualifiability cases. Whether there was a constitutional violation or a constitutional bond here, whether it's clearly established, taking into consideration that this occurred in 2008. Well, I think we need to get out of it. What would you submit? By the way, it takes a lot of lab work to support a fine print, but it's clearly established back then. Well, it's been clearly established in this circuit since the early 1990s with the predecessor device that a taser is a significant use of force. And so any significant use of force that is unjustified violates the Fourth Amendment. And I think that was held way back when they said the Hickey case, the one where the prisoner wouldn't clean his cell. There's also the case that I would refer to. Well, I mean, that sounds like a correct statement, in principle. But doesn't the case law tell us that it was clearly established upon the analysis that we have to look at the factual circumstances and decide whether a reasonable officer would have known or should have known that the particular conduct in those particular circumstances, whether it was clearly a violation of the law, that was clearly established. And so we look at cases that have been down since that time, and I ask that they're brought up. I just wonder whether you can go to the side of this particular circumstances, these particular factual circumstances that have been adequately discussed in other cases, that would give these officers fair warnings in the street with respect to the crime. Well, I think the answer to the question is yes. And I would point you to the Brown v. City of Golden Valley case, which was actually drafted by Judge Molden, where a motorist was drive-stunned without sufficient justification. And even though there was a lack of prior case law on the use of this device, there's actually a footnote that discusses this footnote a lot. Because the X-26 has only been marketed since 2003 and has become ubiquitous in law enforcement, but it's taken a certain period of time to work its way up into the circuit. But in the 11th Circuit case that we cited, facts very similar to this, where a psychotic individual was caged over and over again until they died. That court denied qualified immunity, saying that caging somebody over and over again until they die is something that a reasonable officer should understand, by the way, is the Fourth Amendment. And you don't need a case book for that. While defendants typically argue that there has to be a case on all fours, which puts the typical plaintiff in a very difficult position because there's such a myriad of circumstances that Fourth Amendment cases arise in. The Supreme Court in Hope v. Stelzer and all the progeny in this circuit repeatedly said the general contours of the right have to be clear. And here the general contour of the right is that no one disputes that a cager is a significant application of force. It's not a question whether the officer should know that caging somebody is an application of force. And every case after the first two, when you should have been handcuffed, was unjustified. And, therefore, they were on notice of violating the Fourth Amendment. They also were on notice that it could have possible deadly consequences. They were trained to have and trained to avoid that. And let's just, off by the way, let's just take a moment on the ADA and discuss very briefly the Sheppard case. I'm sorry, not Sheppard. The Roberts case, which you brought the panel on, which discussed the ADA liability as if the officers were personally liable and qualified immunity to their claim. The way that the plaintiffs view the ADA, the way that we interpret the eight circuit cases on the ADA, it's vicarious liability of the entity through the officers. And it's not a failure of the entity to train. In fact, these officers were well trained. Two of them had 40 hours of specific training in dealing with the mentally ill. They all had this case or training about the window of opportunity. There was a failure to accommodate the disability, which in this case was mental illness, during the apprehension process. Now, there's this circuit case of Hines, where this man attacked the officers with a knife, where the circuit ruled that the ADA doesn't come into play until the person is controlled. Every other circuit has rejected this view, most recently the Ninth Circuit in the Sheehan case, which was the subject of our 28-J letter. And we cited a passage in the Ninth Circuit where they surveyed all the other circuits. This circuit has never ruled on, for example, the Ball case. Mr. Burton, the Roberts has been on for some time. Have I done 15 minutes already? Pardon? Oh, well, thank you. Unless you have any questions. Did I reserve any time for a vote? I thought I reserved five minutes. Did I? Have I gone 15? You've gone 17 minutes. My accommodation. Well, maybe we'll give you a little bit. Do you have a light at the moment? Do you have a case that you're urging for a vote? I was just busy talking to you. I can't obviously say anything. The Redmond has not been here. Thank you, Judge Roberts. Thank you, Judge Roberts. Good morning, Your Honors. I have an email to visit the Board. I'd love to address some of the questions, particularly to Judge Shepard. The question is about the State of the Law. And I think that's really one of the key elements in this case and for really deciding this case. The District Court, of course, was completely correct in their assessment of the record. And, in fact, they're not disputing. This was a highly volatile, tense standoff with a gentleman that was strong, resisting. He was not wearing a handcuff. And he was 45 degrees outside. He was lying on his stomach with his hands behind his back. But that was the beginning of the encounter with this gentleman. And I'm telling you, the officers see this gentleman comes out, and he assumes the position. And they see a gentleman that is complying. And you then see the record is clear. There was a person who moves in, Officer Money. He's crossing the street. He holsters his weapon. They're moving in to handcuff him. The problem is that this then becomes a different situation in the setting. He jumps up, turns himself, falls his fist. And now we start looking at a person who is lying there, who are honestly not expecting this gentleman to start resisting. They had some ideas who would resist. He had just engaged in felony restraint, property damage, assaulting a neighbor. He had, there were two gentlemen near him within 20 feet. There were two other gentlemen, two other officers that were, the distances weren't established by the record. One is across the street, and one is a little bit further by the curb. There's one officer that is across the street, the victim of Mr. Du Bois' crimes. His neighbor, Mrs. LaPointe, had another gentleman that was working at LaPointe's home, including the plaintiff, Mr. Eugene Du Bois. So you have five officers, but they're in varying places around this suspect. How many were reasonably close to them in terms of physical contact? Two officers were reasonably close. But if you remember, the record establishes that Officer Persich and Officer Money, who starts out across the street, are really effectively going to be the handcuffing officers. You've got two officers that have been committed. Let's go back to the record. It was established, no question, that he had access to weapons, including a gun, which was found in the home. So the officers set up containment to deal with that situation, which means you're going to need some deadly force, some deadly force cop. You have two officers that have been committed to long guns. They are not going to make you go hands-on. They can't just put down their weapons or hold them on their back. They are committed to those weapons. What they do do is put it on you already, put it down. Even when he does mention the weapon, they're not going to shoot you. The guy is not at all armed, so that's not an appropriate weapon. Then the two officers are effectively close. Sometimes they're about 20 feet, 25 years. It varies with the record where they are exactly because they're moving. This is a dynamic situation. It's tense. It's rapidly evolving. So you have one officer, that is Officer Persich, the defendant in this case, who really starts out by putting his handcuffs on his belt, and he's moving in. That's the first thing he does. Officer Persich has a cover. It is required by policy, customs, etc., that you have a cover officer. The CIT training says that. The Taser training says that. You must have a cover. So Officer Persich's first role is to get this guy cuffed, controlled, and that's what he does first. But it changes. And then he must react to that. He does some quick assessment in his mind of what he's going to use, and he decides and writes this over the Taser. It's the least dangerous option. It would create the safest environment given the options of going hand-to-arm or using a baton on the showman or using even a mace on this gentleman. So the officer can do his assessment, and they go with that. And then the question for the court, then, is, well, it was clearly established in this circuit that using the Taser, even repeatedly, on a resisting, noncompliant, aggressive gentleman is clearly established when you do it. And Mr. Burns certainly spent enough time on the issue of training. But the training, and the facts are in the record, Congress, the training doesn't say, you must do this. It is qualified for good reason. We want the officers at discretion to be able to use different tools depending on the situation. Did they in any way violate the instructions that come with the Taser? No.  It says when practical, when safe to do so. And that training supports this idea of officer discretion. Did they violate any of the instructions that they were given? No. I will not, I will not, there's nothing in the record that says they didn't do, and they didn't, and they said that they did. They said they were trained to use the weapon when practical, and the Taser training that is in the record, the excerpts of the training says, it contemplates using multiple silencers. It contemplates when practical to do so. It doesn't have a cookie-cutter approach. And I would suggest, Your Honors, that it's really impossible to even have a cookie-cutter approach in these situations because they're so tense and ever-changing that you have to have certain boundaries. What was the effort of these officers? That he was going to assault them, that he was going to get close enough to grab their weapons. And every officer testified that they would not shoot him. They weren't going to shoot him. So the only other options they had, and I would suggest to this Court's precedent, what was that? They had attempted to grab their weapons. They would have been in close proximity. Yes. And there were two officers. They would have been close proximity. They would have. One officer would have been the officer that, one would have been the cover officer in the legal force, and one would have been the officer. Presumably, in your scenario, it's Officer Persich. He has a taser and the plaintiff, let's say the plaintiff gets it, grabs him. He would be in close proximity to grab his weapons. Physical harm, hallucination. All the officers testified that he had barricaded his, he had basically barricaded his mother and his home. Assaulted her. That's all in the past. That's all in the past. He's not going to run back into this. Well, that's a concern is that he doesn't get in there. They must take this gentleman into custody. Well, of course they did, and they should. And the men were— Was there any reasonable alternative to what they did?  They used the least dangerous means that they had available. Well, I'm not saying that the first application was the least. It would come down to maybe the final application. Well, Your Honors, in that instance, they conceded the first application. So then we apply the ram factor test. That's what the Supreme Court has told us, and that's what this Court has done time and time again. And when we look at each time, he is resisting, and is he presenting a danger? He's following his fists and charging the officers. He is swinging his fists at the officers. I would suggest that in each of those instances, he's a danger not only to the officers, but eventually to himself. And in each of those instances, you have a resisting criminal defendant, and it's appropriate to use some kind of force in taking these suspects into custody. The Supreme Court counseled firearms, pincers, batons, all necessary for police officers to do their job. Sometimes in the line of duty, the police officer, given the number of officers that were here, doesn't let the hooded officers simply step in and make physical contact with a disordered person. And if it's a police officer, we have to have someone here who is obviously in the wrong. I think you're just going to call him to take him, correct? Yes, Your Honor. Why don't I take this window of opportunity, because it's the duty to take the man into custody. That's the age-old duty in the practice of law enforcement sometimes, is to physically take someone into custody. Why? Using this window of opportunity that they're trying to provide. And I would suggest that the window of opportunity is only as good as the officers. I'm sorry. The window of opportunity is only as good as the officers think it's safe and practical to do so. That would be my first point. And the officers testified in the record that they didn't feel it was safe. But what does that mean? Your Honor is suggesting the officers should go hands-on. That they should basically just warn the guy and fight him. And I would suggest that they did eventually do that. And it wasn't at no cost to them more than the defendant. I'm sorry, more than the plaintiff. Because a fight ensued, an officer was kicked, and it was a physical struggle. The problem is that the officers, we don't, I hope we don't, and I hope nobody suggests in court that they're expected to be punching bags for these suspects. And I agree that at one point, going hands-on, after you've used something that is working or not working, it's appropriate. But I don't necessarily think that it should be the first thing. I don't think that we should put officers in harm's way. And the case law cites time and time again the very reasonable proposition that going hands-on is a cost not only to the officers, but also to the plaintiffs. In this case, it causes injuries. And the research on tasers and headaches … They're not available. Pardon me? Usually not available. They're quite often not available. Well, that's a very good point, Your Honor. That is a question that is not decided by the minor, that this caused this person's death. And, in fact, Cockrell cites the DOJ study, the Department of Justice, that says tasers are, in the uses of tasers over a period of 10 years, 99.7% of them caused no injuries for a minor. And does that include the 50, 40-second application? The DOJ study included different … Different statistics rather than individual cases. Well, if you're looking at the individual case, Mr. Du Bois, by the time the EMTs are in there, he is still struggling. He is still speaking. He is still moving. He is still resisting. This is not a measure that is in any way, right now, at least apparently, harm. The EMTs … Did any of these other far-crowned officers come close to the scene? The officer running approached. He was one of the other hands-on, hand-cuffing officer. Officer Persich approached. Life of the state is covered, and the two officers that had long guns, Officer Kemmerer and Officer Maitland, were across, well, by the street. They were far enough away, and nor could they engage him by getting too close. So, basically, you're saying … So, at no point did these six officers ever sort of form a semicircle around this man? They were beginning to. If you remember, Your Honor, the record says that they're starting to form a containment, but Sam suddenly came out. And so they really never established what would be a proper containment, and they certainly didn't have that kind of time once he went outside. But that doesn't tell us how close they ever came to him at one given time. Well, Officer Lively testifies that he was on his way towards the back when suddenly Sam comes out. So you have some idea where he is. Officer Maitland established himself by the curb. Officer Kemmerer, that was not established by the record. And Officer Lively did testify in the record that he was across the street, and he starts to make his way the first time. So I think we have some idea. And Officer Williams is clear. He is across the street from the family. He does not, unfortunately, make it across the street. And he shouldn't. He should be there with the victim, who is a potential object of Sam's threats. And the officers certainly don't want to get into that situation, hitting the victim or the family where they're at. Well, what role does the fact that this man was obviously emotionally disturbed play in the equation? After all, it's an objective inquiry. Was the force objectively reasonable? I would suggest you are right. And would that be the case? Do we need to factor that into the equation here, that a man is obviously emotionally disturbed? I think he's not going to flee well in the first place. No, he's not, Your Honor. Although he did have the potential, and no, Jesus has got to go, to my officer says he wants to flee. But with regard to mental illness, I think it's clear by the way he said it, that this gentleman is a threat, whether it's mental illness or not. And the problem with accommodating or dealing with a mental illness before he's safe and secure, and the bystanders are safe, the police officers are safe, it's just not exactly appropriate until it is controlled and safe. He's a danger. In the Ninth Circuit, in a case titled O'Rourke v. Rutherford, it said that the government interest in using force is diminished by the fact that officers are confronted, not with a person who has committed a serious crime against others, but a person who has made a deal. Would you agree with that, that the government interest in using force is diminished by that? I think that if the scenario is that he's committed no crimes against a mental illness, and the police officers, he's not armed, he's not resisting against a mental illness, there's a great diminishment. He's unenforced in that case. He's likely to be going to comply. The problem is that that's not the situation. And I would suggest that Sam was as dangerous as any other felon at that point. And, you know, I think that that is a factor. And I think it distinguishes some of these other cases where they're not resisting. The realistic, objective matter, were any of the nearby officers really in any danger of physical harm to themselves? Please also tell the public that it's an occupational hazard. I know a little bit about that. It's an occupational hazard. It's an occupational hazard. If you don't want that sort of thing, don't go to the police. Whether it's domestic fights or this or that or the other thing, you put your life on the line in a way that you're not too uniform. Would you agree to do that? I agree. I think if you can diminish some risks to yourself, I think you should take them. I think that's appropriate. If you're not unenforced by our society, then what do you expect the police officer to do? I find that this course was not reasonable. I remember years ago, a late pitcher in our army. He was wearing a corset and a facelift and so on, involving civil action. The jury would, in a way, be making a moral decision. If this is not acceptable in this situation, in this particular location, then this is not morally acceptable. By morally, this isn't a word of objective and reasonable behavior. Shouldn't the jury be invited back after dissemination in this case? Well, I would suggest that the state of the law would conclude that part. The state of the law, part of qualifying the community analysis, would conclude that it's going to be jury in the first place. Because the law was not clearly established at that time. I agree. You don't have to have a case in all fours. You don't have to have a case in the second case. There was other literature. There was other cases. These officers knew. They were trained. They know what the case is. They're ready for certain questions. Well, I would suggest that they were trained to understand that these were effective tools in certain situations. And they knew that it was a hazardous tool when applied with excessive applications from one to the other. In certain instances, there's a possibility that that's true of pepper, of batons. That's true of any weapon. No, but we're talking about something probably on top of the batons. They're very rare. The record is certainly not established as far as I'm concerned. And it's certainly not – that fact is not established in this record. And you're saying it did not violate any of the training protocol? It is qualified. It is only where it's reasonably practical and where it's applicable. The officer wants to decide that he can use it. It's a determination ultimately. A reasonable officer decides, given the facts and circumstances of the situation, whether he can apply that force to them. An effectively reasonable officer, in the circumstances presented to that officer. Well, and for purposes of clearly established, it certainly wasn't established, that a policy is going to create a constitutional right. I think that would diminish any kind of police department's incentive to even have policies and not have a list. No, that's a fraction, sir. That's a fraction, sir. My time is up. Well, thank you, Your Honor. Thank you, Your Honor. None, Your Honor. Pardon? He has no time, Your Honor. Okay, thank you very much, Your Honor. Just very quick points, and I apologize for going over. There were six officers, not five, present Monday morning. Well, I got to hear your version of it. They were close in proximity. They had laid their weapons down and surrounded him. Peacefully, or relatively peacefully, sitting there. Exactly. This isn't working for us. Tell us what happened. Tell us what happened in terms of their relative proximity to this man and the fact that he couldn't do anything without a warrant to chase him. Officer White, who was right there, simply had to put his handgun in his holster, move in, and handcuff. I would just say, in terms of grabbing guns, that was a reason for officers never to get close to suspects. No one would ever be handcuffed. It's simply necessary for officers to get close to people sometimes. In terms of a reasonable alternative, that was following the training. Now, whether they violated the training because of the circumstances, and the training is walk, immobilize by the taser, move in, and put on handcuffs, that's a jury issue. And the officers are specifically trained, and this is in the record, that an emotionally disturbed person, especially having been tasered, is not necessarily going to be able to respond to commands. So, the only alternative is to go hands-on. In terms of the danger of the device and the cause of death, that's not in the record on this summary judge motion, on this appeal. I would just note one thing, that when the paramedics got to him, they injected him with a sedative that's benzodiazepine. And this is in the record. When the autopsy did the toxicology test, there was no benzodiazepine detected in his blood system, which meant that his blood stopped circulating, which meant he was in cardiac arrest before the paramedics injected him. So, unless there are any other questions, I think we're all done. In terms of time, the officers gave a very close approximation of how much time he lasted in the moment. They ordered him to resume the position until they finally were able to put on the cuffs. Well, we know that there was two minutes of tasering. So, from the time he lied down, his raw estimates, we don't have a good time stamp. At some point, he stood up and said, you know, Jesus, got to go. Then there was the first tasering. And it was more than two minutes later. Well, my question is, how rapidly evolving a situation was it? I don't think it was a particularly rapidly evolving situation. But he did leap to his feet. He did stand up and say, you know, Jesus, got to go. And then was tasered and dropped. That's it. And then the force that the plaintiff complains about started after that. And they did move in and handcuff him that way. Very well. We thank both sides for their argument. We thank our speaker for his input. And in the case of non-persuasion. I thank you very much.